UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| EDERVALDO RODRIGUES DA SILVA, | * | |
| | * | |
| Petitioner, | * | |
| | * | |
| v. | * | Civil Action No. 24-11280-ADB |
| | * | |
| JÉSSICA SILVEIRA DA SILVA, et al., | * | |
| | * | |
| | * | |
| Respondents. | * | |
| | * | |

**<u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>**

BURROUGHS, D.J.

      Edervaldo Rodrigues da Silva ("Petitioner" or "Edervaldo da Silva") filed a petition for the return of his ten-year-old son, A.R.,[1] to Brazil, pursuant to the Hague Convention on the Civil Aspects of International Child Abduction ("the Hague Convention" or "Convention"), as implemented by the United States by the International Child Abduction Remedies Act ("ICARA"). A.R.'s mother, Jéssica Silveira da Silva ("Respondent" or "Jéssica da Silva"),[2] with whom A.R. is currently living in Lowell, Massachusetts, opposes the petition, arguing that A.R. was not wrongfully removed from Brazil within the meaning of the Hague Convention and that, even if Petitioner can make that *prima facie* showing, A.R. should not be returned to Brazil because Petitioner consented to his removal, A.R. is well-settled in his new environment, and returning him to Brazil would put him at a grave risk of harm.

---

[1] To protect the child's privacy, the Court refers to the child as "A.R."

[2] The Respondent's now-husband, Gilberto Lucas, was also named as a party to this action, but he was dismissed during the bench trial. [ECF No. 38 ("Day 3 Trial Tr.") 4:8–23].

## I.     PROCEDURAL HISTORY

Edervaldo da Silva filed his petition in this Court on May 14, 2024.  [ECF No. 1].

Following some motion practice, the Court conducted a three-day bench trial on October 15, 16,

and 17, 2024, during which it heard testimony from both parties, Respondent's brother-in-law

and his wife, and A.R.'s former third-grade teacher.

The Court now makes the following findings of fact and conclusions of law in

accordance with Federal Rules of Civil Procedure 52(a).

## II.     THE HAGUE CONVENTION

Over one hundred countries—including both the United States and Brazil—have signed

the Hague Convention on the Civil Aspects of International Child Abduction.[3]  Those countries

"[d]esir[e] to protect children internationally from the harmful effects of their wrongful removal

or retention and to establish procedures to ensure their prompt return to the State of their habitual

residence, as well as to secure protection for rights of access[.]"  Convention on the Civil

Aspects of International Child Abduction pmbl., Oct. 25, 1980, T.I.A.S. No. 11670, 1343

U.N.T.S. 89.  "Broadly speaking, the Convention aims to deter parents from abducting their

children to a country whose courts might side with them in a custody battle."  Díaz-Alarcón v.

Flández-Marcel, 944 F.3d 303, 305 (1st Cir. 2019).

Under the ICARA, 22 U.S.C. § 9001 *et seq.*, which implemented the Hague Convention:

> Any person seeking to initiate judicial proceedings under the Convention for the
> return of a child or for arrangements for organizing or securing the effective
> exercise of rights of access to a child may do so by commencing a civil action by
> filing a petition for the relief sought in any court which has jurisdiction of such
> action and which is authorized to exercise its jurisdiction in the place where the
> child is located at the time the petition is filed.

---

[3] See Status Table, HCCH, https://www.hcch.net/en/instruments/conventions/status-table/?cid=24 (last visited Feb. 4, 2025).

22 U.S.C. § 9003(b).  The purpose is to "restore the pre-removal status quo and discourage a parent from crossing international borders in search of a more sympathetic forum."  Whallon v. Lynn, 230 F.3d 450, 455 (1st Cir. 2000).

The Convention does not empower the Court to make any determinations regarding child custody.  See 22 U.S.C. § 9001(b)(4).  The Court is tasked solely with determining whether that custody decision should be made here in the United States or by A.R.'s country of habitual residence, Brazil.  See id.  "The Convention's underlying principle is that the courts of a child's country of habitual residence should be the entities to make custody determinations in the child's best interest."  Mendez v. May, 778 F.3d 337, 343 (1st Cir. 2015).  Therefore, "children who have been wrongfully removed from their country of habitual residence must be returned, unless the abductor can prove one of the defenses allowed by the Convention."  Danaipour v. McLarey, 286 F.3d 1, 13 (1st Cir. 2002).

## III.  FINDINGS OF FACT

### A.  The Parties' Marriage and the Child's Life in Brazil Before the Parties' Divorce

Petitioner and Respondent are both citizens of Brazil.  They married on May 13, 2011, and welcomed A.R. on ▮▮▮▮ 2014.  They all resided together in the state of Minas Gerais, Brazil.  During the parties' marriage, Respondent did not work outside the home and Petitioner was intermittently employed, though he was employed when A.R. was born.  While Respondent has been A.R.'s primary caregiver his entire life, Petitioner was involved in A.R.'s care when A.R. was young, including bathing and feeding him and bringing him to school.

Petitioner and Respondent separated in or about 2016.[4]  While Petitioner testified that the separation was caused by Respondent's purported infidelity, Respondent credibly testified that she was unhappy in her marriage to Petitioner for various reasons, including his consumption of pornography and purported unlawful activities,[5] which ultimately led to a separation.  After the separation, A.R. continued living with Respondent in the family home, and Petitioner moved out. Respondent and A.R. eventually also moved out of the family home.  In Brazil, A.R. lived at all times in close proximity to Petitioner.

At the time of the separation, the parties did not have a formal custody agreement. Petitioner paid intermittent child support in the amount R$180.00 per month, but Respondent nonetheless struggled to support herself and A.R.  Respondent recalled one instance where Petitioner received a visa gift card from his then-employer, but he refused to give the card to her so that she could purchase groceries for her and A.R.  As the parties argued and Respondent tried to take the card from Petitioner, he twisted her arm.  The altercation, which Petitioner did not remember, caused Respondent to call the police and file a report.

After the separation in 2016, but before a formal divorce agreement came into effect in December 2021, Respondent testified that A.R. saw Petitioner about twice a month, but he sometimes failed to meet A.R. at agreed upon times.  Although it is unclear how frequently

---

[4] The parties stipulated that Petitioner and Respondent separated in or about 2018.  [ECF No. 28 at 8].  Nonetheless, at trial, both parties testified that the separation occurred in or about 2016. See [ECF No. 36 ("Day 1 Trial Tr.") 30:16; ECF No. 37 ("Day 2 Trial Tr.") 14:20-21; but see [Day 1 Trial Tr. 88:23-24 (Respondent testifying that the parties separated in 2018)].  Given that Respondent also testified that the parties were not separated for the entire period between separating and filing the divorce, [Day 1 Trial Tr. 20:14–15 ("We were back for a while, but then we just separated until the divorce came.")], the Court finds that the parties initially separated in 2016, were back together for some time between 2016 and 2018, and in or about 2018 separated permanently.

[5] Respondent described one instance during their marriage when Petitioner stole a cell phone from a neighbor's house.

4

Petitioner saw A.R. during that time, Petitioner credibly testified that he spent quality time with his son, including by taking him to the shopping mall, park, food court, or picking him up from school.

### B. The Parties' Divorce

In early 2021, Petitioner filed for divorce.[6]  On December 10, 2021, a Brazilian court entered a divorce judgment ("Divorce Agreement"),[7] which set out the parties' custody and visitation rights.[8]  The Divorce Agreement provided in pertinent part:

- "[T]he custody of the minor [child] will be shared, and he will reside with his mother;"
- "[T]he father will live with the child and have him in his company on alternate weekends, picking him up on Friday at the mother's residence at 5:00 p.m. and returning him on Monday, also at the mother's residence, at 9:00 a.m., starting on December 17, 2021;"
- "[E]ach parent will have the child with them for half of the January and July vacations and school breaks, with the first half going to the parent who is with the child on New Year's Eve;"
- "[E]ach parent will have their child with them on alternate holidays . . . holidays that fall on the weekend will be the responsibility of the parent who is with the child on the weekend;"
- "[I]n odd-numbered years, the mother will be with the child at Christmas, while the father will have the child with him on New Year's Eve, the situation being reversed in even-numbered years;"
- "[O]n Father's Day, Father's Birthday, Mother's Day and Mother's Birthday, the child will stay with the party being feted;"
- "[T]hese regulations may be waived by the parties, provided there is prior agreement and communication;"
- "[T]he father will pay child support to [the child], from January 2022 onwards, the amount corresponding to 20% of his net income, by the 10th of each month . . . ."

[JX-11.0009 (Joint Trial Exhibits "JX-__")]; see also [ECF No. 28 at 8].

---

[6] Since the divorce, both parties have re-married and currently live with their respective spouses.

[7] The parties seemingly agreed that the divorce judgment may be referred to as the "Divorce Agreement."  See [ECF No. 28 at 8].  Accordingly, the Court adopts the parties' terminology and refers to the divorce judgment as the "Divorce Agreement."

[8] The parties provided a translation of the Divorce Agreement and stipulated to the facts concerning its contents.  [ECF No. 28 at 8].

Respondent testified that after the Divorce Agreement went into effect, Petitioner saw A.R. approximately every other weekend, including for overnight stays. Petitioner confirmed that he complied with the terms in the Divorce Agreement except on two occasions: in January 2022 when he missed a vacation with A.R. and in February 2022 when he had COVID-19 and did not visit his son. In accordance with the Divorce Agreement, Petitioner, who was employed for at least part of the period after the agreement came into force,[9] paid child support consistently in the amount of R$240.00 per month. The last time Petitioner saw A.R. on a scheduled weekend visitation was the second week of March 2022.

### C. Respondent and the Child's Travel to the United States

Sometime in 2021, Respondent met her now-husband, Gilberto Lucas Torres Dos Santos ("Lucas"), in Brazil.[10, 11] Toward the end of 2021 and continuing into 2022, Respondent started planning to move to the United States to join Lucas, who had already relocated to Massachusetts. Respondent intended to take A.R. with her but, in order to do so, needed to obtain a passport for him. The passport application required the signature of both parents, and, on February 3, 2022, Petitioner and Respondent signed the application at an office of the federal police.

The passport application stated that a parent signing the document would thereby consent to a "travel authorization," allowing the child to travel internationally with only one parent. [JX-6.003]. Respondent repeatedly requested that Petitioner sign the passport application. Petitioner did not read the application prior to signing it and was therefore unaware of the travel

---

[9] At the time of the trial, Petitioner was last employed in April 2023.

[10] The precise date when Respondent and Lucas first met is unclear from the trial testimony. See [Day 2 Trial Tr. 28:23-24 (Respondent testifying that she meet Lucas in 2021); Day 2 Trial Tr. 6:13-15 (Respondent stating that she met Lucas only one month before coming to the U.S.)]; Day 2 Trial Tr. 57:9-12 (Witness Bruna Coutinho Suarez Dos Santos testifying that she believed that Respondent had been dating Lucas for about a year prior to arriving in the United States).

[11] On or about September 18, 2024, Respondent and Lucas were married in Lowell, Massachusetts.

authorization.  Respondent, however, testified that, by the time he signed the passport

application, she had already, on multiple occasions, made Petitioner aware of her plans to leave

Brazil with A.R.  That said, Petitioner credibly testified that he was unaware that Respondent

intended to obtain A.R.'s passport so that mother and son could permanently relocate to the

United States.[12]

    In early to mid-March 2022, A.R. told Petitioner about possible travel plans.  Petitioner

was aware that Respondent's now-husband Lucas was, at that time, already in the United States,

and, because Respondent had told him that she was going to travel to the town of Vitória in the

state of Espírito Santo, he became concerned that she would take A.R. to another country.  As a

result, on March 17, 2022, Petitioner submitted a written request to the federal police that his

son's passport be revoked.  On March 25, 2022, before Respondent and A.R. traveled to the

United States, Petitioner texted Respondent informing her that he had submitted a request to

cancel A.R.'s passport, but Respondent did not believe him.  She told Petitioner that he needed to

pay a fee to cancel the passport, which he never did.  Respondent also testified that Petitioner

told her of the cancelation the same day she and A.R. traveled to Vitória and that Petitioner was

---

[12] In order to arrive at its findings of fact, the Court has either explicitly or implicitly resolved
conflicting testimony.  Here, Petitioner offered inconsistent testimony about whether he knew
why Respondent was so insistent about obtaining a passport for A.R.  Compare [Day 1 Trial Tr.
72:5-15, 43:17-23 (testifying that he signed the passport application for A.R. for documentation
purposes and that he and Respondent never discussed travel plans); Day 1 Trial Tr. 75:11-24
(testifying that he believed that Respondent would travel with A.R. "[i]n the future, not now")],
with [ECF No. 30-8 ("Petitioner Dep. Tr.") 11:19-23 (stating that Respondent had asked him to
authorize A.R.'s passport application so that his son could travel to the United States, but "not to
live.")].  After listening to each witness and observing their demeanor, and given the fact that
Petitioner consistently stated that he did not want Respondent to remove A.R. permanently from
Brazil, the Court finds that Petitioner credibly testified that he did not know that Respondent
intended to obtain A.R.'s passport for the purpose of permanently relocating abroad, even if he
knew of some potential for temporary international travel.

supposed to meet them to say goodbye to his son.  The day Respondent and A.R. journeyed to

Vitória was Petitioner's regularly scheduled visitation time.

For reasons unknown to the Court, Petitioner's request to void the passport was

unsuccessful, and, on March 28, 2022, A.R. left Brazil with Respondent.[13]  From Vitória, Brazil,

Respondent and A.R. first traveled to Colombia, then to Mexico, and from there crossed the

border to the United States, arriving on April 3, 2022.  Lucas' brother Jalmar Junior Torregs Dos

Santos ("Dos Santos") and his wife Bruna Coutinho Suarez Dos Santos ("Coutinho"), as well as

three other people from Lucas' extended family, traveled with A.R. and Respondent, and they all

arrived together in the United States.  Coutinho met A.R. for the first time when they began their

journey to the United Sates.

Unaware that A.R. had already left the country, Petitioner filed a police report on March

30, 2022, stating that he feared that Respondent would move to the United States with A.R.

without his consent.[14]  On April 11, 2022, Petitioner learned from a family member that A.R. was

no longer in Brazil.  Petitioner then searched for Respondent on social media and discovered

from information she had shared on Instagram that she and A.R. were in the United States.

### D.  The Child's Life in Massachusetts

Since April 2022, just before his eighth birthday, A.R. has lived in Lowell, Massachusetts

with his mother and her husband Lucas.  When A.R. and Respondent first moved in with Lucas

they were also joined by Dos Santos and Coutinho.  At that time, Lucas also housed his cousin,

his cousin's wife, and their two children.  Dos Santos and Coutinho lived with A.R., Respondent,

and Lucas from approximately April 2022 until April 2023 when they moved to Gloucester,

---

[13] The translation of the relevant document incorrectly provides that the date A.R. exited Brazil was March 26, 2022.  See [JX-32.004].

[14] Petitioner's contested Exhibit 12 was admitted into evidence as Trial Exhibit 43.

Massachusetts, where they currently reside.[15]  Since moving to Gloucester, Dos Santos and Coutinho see A.R. about twice a month.

Respondent and Lucas have moved apartments once since A.R.'s arrival, but both apartments were located in Lowell.  A.R. has always had his own bedroom.  Respondent testified that A.R. has a healthy relationship with her husband.

Respondent currently works as a cleaner.  She typically works between two and four days a week and estimates that in one working day she earns approximately $150.00.  Since August 2023, she has been attending a beauty school and hopes to work as a beautician upon graduating and passing the relevant Massachusetts state exam.  Lucas works as a carpenter and earns approximately $2,000.00 per week.  Respondent has never been late paying her rent.  Coutinho further testified that she is willing to support Respondent financially should she need assistance.

In addition to Dos Santos and Coutinho, Respondent's husband has other extended family living in Massachusetts.  Together with the extended family, Respondent and A.R. celebrate holidays such as Thanksgiving and Christmas, as well as other special events, including family members' birthdays.  One extended family member, Lucas' cousin's daughter, Sophia, is just a few years younger than A.R.  Sophia and A.R. play together whenever they meet.

A.R. started attending the Greenhalge Elementary School in Lowell, Massachusetts in September 2022.  Although he was initially placed in third grade, he was moved to the second grade to promote his learning.  During his first year at Greenhalge Elementary, A.R. missed ten days of school, and the following year, as a third grader, he missed nineteen days.

---

[15] The trial testimony did not clearly convey when Lucas' cousin, his wife, and two children moved out of his apartment.

When A.R. first joined Sarah Hoey's ("Hoey") third-grade classroom in 2023, his behavior could be disruptive, as he often lost focus, got distracted and then disturbed his peers' learning. A.R. was performing at the lower end academically. Toward the end of the academic year, however, Hoey noticed a shift in A.R., and he became more motivated and willing to learn and better at avoiding distractions. He began to ask questions and proactively sought support. A.R. was eager to show that he was improving.

When A.R. began his schooling in the United States, he had little to no English-speaking skills and could not read or write in English. Greenhalge Elementary provides support to students with limited English, and A.R. receives daily language development instructions from an English Language Learning ("ELL") teacher. By the time A.R. moved onto fourth grade in the fall of 2024, his English had improved, and he was able to communicate with his teachers and peers in English. He even began to translate for his Brazilian classmates when they struggled to understand English.

A.R.'s teachers communicate with Respondent through a school communication app, called DOJO. Through the app, the teachers update Respondent on A.R.'s behavior at school. Between November 2022 and February 2024, Respondent received several messages from A.R.'s teachers and school administrators raising concerns about A.R.'s behavior toward teachers and other students.[16] Respondent further testified that in 2024 the school alerted her that A.R. had been involved in a fight.

---

[16] These text messages, [Trial Ex. Nos. 44–49], were admitted into evidence but not for the truth of the matter asserted.

Respondent also testified that she, A.R., and Lucas attend church about twice a month. At church, A.R. participates in group activities for children. As of August 2024, Respondent enrolled A.R. in a soccer program. A.R. has friends in his school as well as in the neighborhood.

On April 3, 2023, Respondent filed an application for asylum on behalf of herself and A.R. The master calendar hearing for that proceeding is set for November 3, 2025, and no date for the final hearing has been set. On or about January 22, 2024, Respondent's application for employment authorization was granted. The employment authorization is valid until January 21, 2029.

Petitioner credibly testified that between April 2022, when A.R. first arrived in the United States, and June 2024, he did not speak regularly with his son, although he was able to have video calls with A.R. Then, in June 2024, Petitioner sought judicial intervention from a Brazilian family court, which stipulated a three-times-per-week video conference schedule with A.R. Since then, Petitioner's communication with A.R. has improved, and he now speaks with his son consistently. Although somewhat unclear, Petitioner seemingly testified that while Respondent at times made it challenging for him to reach his son, she never outright prevented him from communicating with A.R.[17]

## IV.    CONCLUSIONS OF LAW

Respondent argues that Petitioner has failed to make the required *prima facie* showing that the child was wrongfully removed, [ECF No. 30 at 22–38], and that even if a *prima facie* case has been made out, several exceptions apply. Specifically, Respondent argues that A.R.

---

[17] See [Day 1 Trial. Tr. 87:9-15 (when Petitioner was asked whether Respondent ever prevented him from speaking with A.R. prior to June 2024, he answered, "[s]he was making it difficult. Not impairing me to talk to him. . . . Q: So [Respondent] did not impair your ability to speak with [A.R.], correct?  A. Correct.")].

should not be returned because Petitioner (1) consented to his son's relocation, [id. at 25–28], (2) filed his petition more than a year after A.R.'s purported wrongful removal and A.R is "now well settled in the United States," [id. at 28–38], and (3) A.R. would be exposed to a "grave risk of harm" if he was forced to return to Brazil, [id. at 38–42]. For the reasons discussed below, the Court will order A.R.'s return to Brazil.

## A. Legal Standard

"A petitioner seeking the return of a child under the Convention must establish the child's wrongful removal," demonstrating, "by a preponderance of the evidence," that he "(1) seeks to return the child to the child's country of habitual residence, (2) had custody rights immediately prior to the child's removal, and (3) was exercising those rights." Mendez, 778 F.3d at 343 (citing 22 U.S.C. § 9003(e)(1)(A)); then citing Sánchez-Londoño v. González, 752 F.3d 533, 539–40 (1st Cir. 2014); then citing Hague Convention, art. 3). If the petitioner can satisfy these three elements, and "commenced judicial or administrative proceedings within one year of the date of wrongful removal," the Court must order the return of the child unless the respondent can establish the existence of one of the exceptions or defenses enumerated by the Convention. Mendez, 778 F.3d at 343. Because "[t]he Convention establishes a strong presumption favoring return of a wrongfully removed child," "[e]xceptions to the general rule of expedient return . . . are to be construed narrowly." Danaipour, 286 F.3d at 13–14 (citations omitted). Respondent has the burden of establishing, by a preponderance of the evidence, that the child is well-settled in his new environment, see Hague Convention, art. 12; 22 U.S.C. § 9003(e)(2)(B), or, by clear and convincing evidence, that returning the child to the country of habitual residence would pose a "grave risk" to the child's safety, see Hague Convention, art. 13b; 22 U.S.C. § 9003(e)(2)(A).

Even if one or both of these exceptions are satisfied, the Court still has discretion to order the return of the child.  Danaipour, 286 F.3d at 14.

## B.  Petitioner's *Prima Facie* Case

As an initial matter, Respondent agrees that Brazil was A.R.'s country of habitual residence, but she disputes that Petitioner had custody rights immediately prior to A.R.'s relocation, or that he was exercising those custody rights.  [ECF No. 30 at 8, 23–25].  In particular, Respondent asserts that the Divorce Agreement conferred Petitioner a right of access rather than a right of custody as required by the Hague Convention.  [Id. at 23–24].  Petitioner contends that he had custodial rights under the Divorce Agreement and under Brazilian law. [ECF No. 29 at 4–5].

> [U]nder the Hague Convention, rights of custody include rights relating to the care of the child and the right to determine the child's place of residence. . . .  Rights of custody are distinguished from "rights of access," with the Hague Convention defining the latter as "the right to take a child for a limited period of time to a place other than the child's habitual residence."

Kufner v. Kufner, 519 F.3d 33, 39 (1st Cir. 2008) (quoting Hague Convention, art. 5).[18]  In Abbott v. Abbott, the Supreme Court has held that a *ne exeat* right, that is, "the authority to consent before the other parent may take the child to another country," is a right of custody within the meaning of the Hague Convention.  560 U.S. 1, 5, 8 (2010).  "Rights of custody 'may arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of [the] State.'"  Aredes v. Aredes, No. 22-cv-10666, 2022 WL 2235853, at *4 (D. Mass. June 22, 2022) (quoting Hague Convention,

---

[18] "The Convention provides no return remedy when a parent removes a child in violation of a right of access but requires contracting states 'to promote the peaceful enjoyment of access rights.'"  Abbott v. Abbott, 560 U.S. 1, 13 (2010) (quoting Hague Convention, art. 21).  "For example, a court may force the custodial parent to pay the travel costs of visitation or make other provisions for the noncustodial parent to visit his or her child[.]"  Id. (citations omitted).

art. 3). "Custody is determined by the law of country in which the child was habitually resident."

Mendez v. May, 85 F. Supp. 3d 539, 554 (D. Mass. 2015) (citing Hague Convention, art. 3(a);

and then citing Whallon, 230 F.3d at 456), rev'd on other grounds, 778 F.3d 337 (1st Cir. 2015).

Here, the Court is satisfied that Petitioner has carried his burden and finds that he had

custody rights immediately prior to A.R.'s removal. Petitioner provided articles of the Brazilian

Civil Code, which state in relevant part that

> [r]egardless of their relation with each other, both parents have the responsibility
> of exercise full family authority over their children, which consists in:
> . . .
> IV – to grant or to deny them consent to travel abroad[.]

[Trial Ex. 51 at 2].[19] The Brazilian Civil Code plainly establishes Petitioner's *ne exeat* right and

thus a right of custody pursuant to the Hague Convention. See also Argueta v. Argueta-Ugalde,

No. 22-cv-12840, 2023 WL 1466820, at *9 (E.D. Mich. Feb. 2, 2023), aff'd sub nom. Rodrigues

Dos Santos Argueta v. Argueta-Ugalde, No. 23-1107, 2023 WL 4635901 (6th Cir. July 20, 2023)

(pursuant to article 1.634 of the Brazilian Civil Code, "each parent, regardless of marital status,

has the right to participate in the determination of their child's permanent residence."); Filho v.

de Albuquerque, No. 20-cv-01421, 2020 WL 9455201, at *9 (D. Colo. Aug. 21, 2020) ("[T]he

Brazilian Civil Code, Chapter V, Section II, article 1.634, grants each parent the right to

participate in the determination of their child's permanent residence. Thus, as explained by

petitioner's expert witness[ ], [the father] had a right equal to that of [the mother] to permit or to

deny a change of [the child's] residence to the United States.").

---

[19] The Court admitted the first three pages of Petitioner's contested Exhibit No. 15, containing
articles of the Brazilian Civil Code and its English translation, into evidence as Trial Exhibit 51.
[Day 3 Trial Tr. 25:25–28:19]; In re the Application of Dulce Esperanza Mendez Gonzalez v.
Batres, No. 14-cv-00799, 2015 WL 12819198, at *1 (D.N.M. Jan. 6, 2015) (Article 14 of the
Hague Convention and Federal Rules of Civil Procedure 44.1 allow a court to consider foreign
codes "in making determinations of foreign law.").

Petitioner has further established that he was exercising his custody rights under Article 3 of the Hague Convention at the time the child was removed to the United States.  Hague Convention, art. 3(b) (a removal is wrongful when at the time of the removal petitioner's custody rights "were actually exercised . . . or would have been so exercised but for the removal"). Notably, courts have construed the exercise of custodial rights liberally and only find a "failure to exercise custody rights on the part of someone with such rights where there were actions that constitute[d] clear and unequivocal abandonment of the child."  Karim v. Nakato, No. 21-cv-11458, 2022 WL 1597955, at *11 (D. Mass. May 20, 2022) (quoting Mendez, 85 F. Supp. 3d at 555) (alteration in original; internal quotations omitted).  By his own admission, Petitioner missed a scheduled visitation and vacation, but Respondent also testified that after the Divorce Agreement went into effect, A.R. saw Petitioner approximately every other weekend, including for overnight stays.  As such, the Court cannot conclude that Petitioner's contact with A.R constituted "unequivocal abandonment."

Having found that Petitioner has made out a *prima facie* case for A.R.'s wrongful removal, the Court now turns to the affirmative defenses asserted by Respondent.

### C. The Consent Exception

Respondent emphasizes that Petitioner signed A.R.'s passport application, which included an express travel authorization provision, after she repeatedly relayed her plans to relocate to the United States.  [ECF No. 30 at 26–28].  Thus, by signing the passport application against the backdrop of knowing the mother's intentions, Respondent argues that Petitioner consented to A.R.'s removal from Brazil.  [Id.].  The Court disagrees.

Article 13 of the Hague Convention provides in relevant part that the Court "is not bound to order the return of the child if the [Petitioner] . . . consented to or subsequently acquiesced in

the removal or retention[.]"[20]  Hague Convention, art. 13(a).  The consent exception is "narrow." Baxter v. Baxter, 423 F.3d 363, 371 (3d Cir. 2005).  The First Circuit has explained that consent is "an inquiry that focuses on [petitioner]'s intent prior to the child's retention," and which "may be evinced by the petitioner's statements or conduct, which can be rather informal."  Nicolson v. Pappalardo, 605 F.3d 100, 105 (1st Cir. 2010) (emphasis omitted); see also Baxter, 423 F.3d at 371 ("In examining a consent defense, it is important to consider what the petitioner actually contemplated and agreed to in allowing the child to travel outside its home country.  The nature and scope of the petitioner's consent, and any conditions or limitations, should be taken into account.").  Importantly, "[t]he key to the consent inquiry is the petitioner's subjective intent," In re Kim, 404 F. Supp. 2d 495, 516 (S.D.N.Y. 2005), which, as a fact intensive query, "depends to a considerable extent on the district court's factual and credibility determinations."  Padilla v. Troxell, 850 F.3d 168, 176 (4th Cir. 2017).  It is Respondent's burden to prove by a preponderance of the evidence that Petitioner consented to A.R.'s removal.  22 U.S.C. § 9003 (e)(2)(B).

The Court determined that Petitioner credibly testified that, contrary to Respondent's assertions, he did not know that Respondent planned to permanently relocate A.R. to the United States at the time he signed the passport application.  Petitioner also testified that he was not aware that the passport application included a travel authorization, as he did not read the document when signing it.  From these facts, the Court cannot conclude that Petitioner had the subjective intent to consent to his son's removal from Brazil.[21]

---

[20] Given that Respondent solely raises the consent exception, the Court need not and will not analyze the acquiesce exception.  See generally [ECF No. 30].

[21] Separately, even if Petitioner had been aware of the concomitant travel authorization in the passport application and signed it with the understanding that Respondent planned to visit the

Further, as soon as A.R told Petitioner about possible travel plans and Respondent informed him about an upcoming trip to Vitória, Petitioner became worried that Respondent was planning to relocate A.R. to the United States and immediately submitted a request to cancel his son's passport on March 17, 2022.  Petitioner's conduct thus indicates that he did not consent to A.R.'s indefinite move to the United States prior to removal.  See Khalip v. Khalip, No. 10-13518, 2011 WL 1882514, at *6–7 (E.D. Mich. May 17, 2011) (finding that respondent did not show consent where petitioner had signed a notarized application approving the child's permanent move but prior to the actual move signed another notarized document revoking consent); Sacchi v. Dervishi, No. 19-cv-06638, 2020 WL 3618957, at *9 (N.D. Cal. July 2, 2020) ("Most significantly, even if [petitioner] at one point did agree that the children could move [abroad], [petitioner] did not agree to their removal . . . when [respondent] took the children [abroad].").[22]  In sum, the evidence weighs in Petitioner's favor.

### D.  The Settled Exception

Pursuant to Article 12 of the Hague Convention, when a child has been wrongfully removed, he must be returned to his home country if a court where the child is located receives a petition for his return within one year of the wrongful removal.  Hague Convention, art. 12; see

---

U.S. temporarily, that fact alone does not evince intent to consent to A.R.'s permanent relocation.  See, e.g., In re Kim, 404 F. Supp. 2d at 516 (explaining that it is "often the case that a parent consents to the removal of a child to a foreign location for a temporary visit, but not to a longer or even indefinite stay in that country.").

[22] Respondent cites to Cascio v. Pace for the proposition that once consent is given, it cannot be revoked.  [ECF No. 30 at 27–28 (citing 992 F. Supp. 2d 856, 866 (N.D. Ill. 2014)].  The Court finds that even if a petitioner provided his consent, he may withdraw it prior to the child's removal.  See, e.g., Tatari v. Durust, No. 24-cv-6930, 2024 WL 4956307, at *6 (E.D.N.Y. Dec. 3, 2024) (summarizing case law where petitioner initially gave consent but then revoked it prior to the child's removal and accordingly no consent was found).  Therefore, to the extent Cascio v. Pace stands for Respondent's proposition, this Court respectfully declines to follow its sister court.

also Lozano v. Montoya Alvarez, 572 U.S. 1, 5 (2014).  If the proceeding commences more than

a year after wrongful removal, the court "shall also order the return of the child, unless it is

demonstrated that the child is now settled in [his] new environment."  Hague Convention, art. 12.

Even if a court finds that a child is settled, it retains the discretion to nonetheless order the return

of the child.  See Yaman v. Yaman, 730 F.3d 1, 13 (1st Cir. 2013).

### a.  Commencing Proceeding More than a Year after Wrongful Removal

With respect to a child located within the United States, ICARA, 22 U.S.C. § 9003(f)(3),

defines "commencement of proceedings" as "the filing of a petition in accordance with"

subsection (b) of 22 U.S.C. § 9003.  Section 9003(b), in turn, requires a person seeking to initiate

judicial proceedings to "commenc[e] a civil action by filing a petition for the relief sought in any

court which has jurisdiction of such action . . . in the place where the child is located at the time

the petition is filed."  22 U.S.C. § 9003(b); see Moura v. Cunha, 67 F. Supp. 3d 493, 499 (D.

Mass. 2014).  As such, only the filing of a civil action in a court where the child is located is

sufficient to commence Hague Convention proceedings; filing an application with an authority of

the country of origin does not suffice.  Monzon v. De La Roca, 910 F.3d 92, 96, 99 (3d Cir.

2018) (proceedings were "commenced" when action was filed in U.S. court where child was

located, not when petitioner filed application with Guatemala's Central Authority); Blanc v.

Morgan, 721 F. Supp. 2d 749, 762–63 (W.D. Tenn. 2010) (filing action with French court and

French administrative authority did not "commence" proceedings within meaning of Article 12);

Muhlenkamp v. Blizzard, 521 F. Supp. 2d 1140, 1152 (E.D. Wash. 2007) ("The petition must be

filed with the court of record, not the Central Authority, to file within the one-year limitation.");

see Wojcik v. Wojcik, 959 F. Supp. 413, 418 (E.D. Mich. 1997) (petitioner's application to U.S.

Central Authority not sufficient to trigger "commence[ment]" of "judicial or administrative

proceedings"). Thus, regardless of any efforts Petitioner may have made through Brazilian authorities, under the Hague Convention, he did not initiate proceedings for present purposes until he filed the Petition with this Court on May 14, 2024.[23]

As to the date of "wrongful removal," which establishes the date when the one-year period begins to run, courts have reached differing conclusions. In some cases, courts have held that the one-year period starts when the agreed upon date for a child's return has passed, see, e.g., Falk v. Sinclair, 692 F. Supp. 2d 147, 161–63 (D. Me. 2010), or the date a petitioner is on notice that a temporary trip to another country has become permanent, see, e.g., Gonzalez v. Nazor Lurashi, No. 04-cv-01276, 2004 WL 1202729 (D.P.R. May 20, 2004), R. & R. adopted sub nom. Gonzalez Locicero v. Nazor Lurashi, 321 F. Supp. 2d 295 (D.P.R. 2004); Dietz v. Dietz, 349 F. App'x 930, 933 (5th Cir. 2009). Other courts have held that the one-year period begins on the date a petitioner's specific custody rights were first breached, when, for example, the child was taken outside of the country for any period of time without the other parent's approval. See, e.g., Flores Castro v. Hernandez Renteria, 971 F.3d 882, 889 (9th Cir. 2020).

Here, Respondent brought A.R. to the United States in April 2022 without Petitioner's consent. Petitioner ultimately filed his petition in this Court in May 2024, more than one year after any of the potentially controlling dates. Further, this "1-year period in Article 12 of the Hague Convention is not subject to equitable tolling." Lozano, 572 U.S. at 18 (affirming Second Circuit's judgment that respondent parent's alleged concealment of child did not equitably toll one-year requirement); see also Yaman, 730 F.3d at 16 (same).

[23] Although there was an earlier petition, the parties stipulated that Petitioner commenced proceedings in the United States on May 14, 2024.

19

Therefore, given the late filing of the petition, the Court will consider whether A.R. is "settled" in his new country. See Hague Convention, art. 12 (judicial authority "shall . . . order the return of the [wrongfully removed] child, unless it is demonstrated that the child is now settled in [his] new environment"); Darín v. Olivero-Huffman, 746 F.3d 1, 20 n.27 (1st Cir. 2014) (recognizing "now-settled" defense).

### b. Whether the Child is Now Settled

"Courts look to the totality of the circumstances in determining whether a child is now settled." da Silva v. de Aredes, 953 F.3d 67, 75 (1st Cir. 2020) (citing Yaman, 730 F.3d at 9) (additional citation omitted). While the Hague Convention is silent on what factors should be considered, courts turn to the following factors when evaluating the settled defense:

> (1) the child's age; (2) the stability and duration of the child's residence in the new environment; (3) whether the child attends school or day care consistently; (4) whether the child has friends and relatives in the new area; (5) the child's participation in community or extracurricular school activities, such as team sports, youth groups, or school clubs; and (6) the respondent's employment and financial stability.

Moura, 67 F. Supp. 3d at 499–500 (quoting In re B. Del C.S.B., 559 F.3d 999, 1009 (9th Cir. 2009)); see also Karim, 2022 WL 1597955, at *16 (citing Moura, 67 F. Supp. 3d at 499) (same).

"Courts also consider the amount of time a child has spent in the country, as well as their academic performance, social networks and relationships, and, under some circumstances, country of citizenship." Moura, 67 F. Supp. 3d at 500 (citations omitted). "A court may consider any relevant fact, including immigration status." da Silva, 953 F.3d at 75. "Although all of these factors, when applicable, may be considered in the 'settled' analysis, ordinarily the most important is the length and stability of the child's residence in the new environment." Moura, 67 F. Supp. 3d at 499–500 (quoting In re B. Del C.S.B., 559 F.3d at 1009). There is a strong presumption of return, and the "United States Department of State has declared that

'nothing less than substantial evidence of the child's significant connections to the new country is intended to suffice to meet the respondent's burden of proof' under the well-settled defense." Luis Alfonso V.H. v. Banessa Cristina A.Z., 512 F. Supp. 3d 633, 645 (W.D. Va. 2021) (quoting Hague Int'l Child Abduction Convention; Text and Legal Analysis, 51 Fed. Reg. 10,494, 10,509 (Mar. 26, 1986)).  Here, based on the evidentiary record before it, the Court cannot conclude that Respondent has met her burden and established that A.R. is settled in the United States.

As to the first factor, which considers the child's age, "courts are not in total agreement as to the existence of a correlation between age and degree of settlement."  Broca v. Giron, No. 11-cv-5818, 2013 WL 867276, at *6 (E.D.N.Y. Mar. 7, 2013), aff'd, 530 F. App'x 46 (2d Cir. 2013); see also Rodriguez v. Noriega, 732 F. Supp. 3d 990, 1001 (D. Minn. 2024) (explaining that it can be difficult to assess how age affects the settled analysis and treating the factor at best neutrally where six-year old child spent half of his life in the United States); Taveras v. Morales, 22 F. Supp. 3d 219, 236 (S.D.N.Y. 2014), aff'd, 604 F. App'x 55 (2d Cir. 2015) (stating that "age can arguably cut in either direction").  Nonetheless, courts have generally concluded that "repatriation of an infant is less burdensome on the child than repatriating an older child, who is more likely to have memories of the United States and more ties to the country."  Taveras, 22 F. Supp. 3d at 236.  Respondent removed A.R. to the United States when he was nearly eight years old and by the time of the trial, two years later, he, at ten years old, was (and remains) "old enough to allow meaningful connections to the new environment to evolve."  Zuker, 2 F. Supp. 2d at 141 (quoting In re Robinson, 983 F. Supp. 1339, 1345 (D. Colo. 1997) (concluding that ten-year and six-year old were "old enough to allow meaningful connections to the new environment to evolve . . . [while] children of a very young age are not.")); see also Castellanos Monzón v. De La Roca, No. 16-cv-0058, 2016 WL 1337261, at *13 (D.N.J. Apr. 5, 2016), rev'd

and remanded, 731 F. App'x 117 (3d Cir. 2018), reh'g granted and opinion vacated sub nom. Monzon v. De La Roca, 736 F. App'x 350 (3d Cir. 2018), and on reh'g sub nom. Monzon v. De La Roca, 910 F.3d 92 (3d Cir. 2018), and aff'd sub nom. Monzon v. De La Roca, 910 F.3d 92 (3d Cir. 2018) (finding a five-year old is old enough to form attachments).  This factor, therefore, weighs in Respondent's favor.

In assessing the stability of the child's residence, the second factor, "courts consider the number of homes they have lived in, the permanence of their residence, and the strength of their community and family ties."  Swett v. Bowe, 733 F. Supp. 3d 225, 282–83 (S.D.N.Y. 2024), aff'd sub nom. Urquieta v. Bowe, 120 F.4th 335 (2d Cir. 2024) (quoting Lomanto v. Agbelusi, No. 22-cv-7349, 2023 WL 4118124, at *15 (S.D.N.Y. June 22, 2023), aff'd, No. 23-993, 2024 WL 3342415 (2d Cir. July 9, 2024)).  During the two years that A.R. lived in the United States prior to trial, he has moved once, though he always lived in the same town.  He has consistently lived with Respondent and her husband, and occasionally with other extended family as well. A.R. has also attended the same elementary school since arriving in the United States.

While these facts "play[] a significant role in the 'settled' inquiry," In re D.T.J., 956 F. Supp. 2d 523, 535 (S.D.N.Y. 2013), the Court, based on the evidence before it, is not persuaded that A.R. has strong family and community ties in the United States.  On the one hand, Coutinho and Dos Santos credibly testified that they care deeply for A.R. and that, after living together for nearly a year, they continue to see A.R. about twice a month.  A.R.'s extended family, all of whom have been introduced to him through Respondent's husband, also gather for holidays and other special occasions.  On the other hand, the Court cannot ignore that A.R. did not know his extended family until he traveled to the United States and that these relationships are relatively new.  He might have spent the past two years with extended family here, but he has also spent

the first eight years of his life with his father and other extended family in Brazil.  See Luis Alfonso V.H., 512 F. Supp. at 646 (in finding the child well settled, the court emphasized that, "[i]mportantly, members of mother's family and members of father's family are present," allowing the child to visit relatives from the maternal and paternal sides of her family).  Further, although Respondent testified that A.R. has friends in his neighborhood and school, "the record lacks information regarding the number or qualities of those relationships."  Noriega, 732 F. Supp. 3d at 1002.  These facts call into question whether A.R. is settled within the meaning of the Convention, and the Court accordingly finds that the second factor, overall, disfavors Respondent's defense or is, at best, neutral.  Habrzyk v. Habrzyk, 775 F. Supp. 2d 1054, 1066 (N.D. Ill. 2011) (In general, "the passage of time alone or minimal evidence of ties to the new environment are insufficient to prove a child is 'settled' under the Convention.").

The third factor requires the Court to assess A.R.'s school attendance and life at Greenhalge Elementary School, where he first enrolled in the fall of 2022.  As an initial matter, the Court observes that A.R. missed a non-trivial number of school days in his first two years at Greenhalge Elementary School: ten days during second grade and nineteen during third grade. While his attendance may be improving, it is nonetheless a fact that weighs negatively in the Court's analysis.

The record also shows that A.R. has struggled academically.  Although he started in the third grade, he was ultimately moved to second grade to promote his learning.  His eventual third-grade teacher further testified about his weak academic performance, although she did note that the transition from second to third grade can be difficult for many students and that A.R. had made progress over the course of the year, becoming increasingly motivated to do well.  That

said, however, A.R.'s report cards show that he nonetheless continued to perform below the curriculum standards.[24]

In relation to A.R.'s language skills, considering that he spoke little to no English when he first arrived in the United States, he has, according to his third-grade teacher, made significant strides in improving his language skills. That said, by his mother's own account, A.R. does not communicate very well in English.

A.R.'s third grade teacher testified that his behavior could be disruptive when he first joined her classroom, though she noticed a shift toward the end of the academic year, as he became more motivated and willing to learn. Separately, the school has repeatedly raised concerns about A.R.'s behavior toward teachers and other students, and, in 2024, A.R. was involved in a fight, which led his mother to be called into the school.

Taking all these facts into consideration, the Court cannot find that A.R.'s school attendance and life at school indicate that A.R. is well settled. This is not to say that he will not prosper in the future, but for the purposes of the Court's analysis, his school experience in the United States indicates that he struggles to adapt to his new environment.

With regard to the fourth factor—whether A.R. has friends and relatives here in the United States—the Court notes that A.R.'s extended family live nearby and that the family convenes on holidays and special occasions, as well as going on social outings to restaurants, the mall, or amusement parks. That said, and as noted above, the Court remains doubtful as to the

---

[24] Hoey testified that report cards do not operate on a pass/fail or strict letter-grade basis. Rather, report cards focus on whether a student is making progress toward mastering the learning standards defined in the Massachusetts elementary school curriculum. A.R.'s report cards show a combination of the grade 1 (defined as "Does not yet understand the Standard, needs support"), 2 ("Beginning to understand the Standard, but needs support"), and 3 ("Making progress towards the Standard"). See [JX-40, JX-41].

strength of A.R.'s relationship with his relatives in the United States. Respondent testified that A.R. has a good or healthy relationship with her husband Lucas, but also said that they usually do not spend time alone together. The testimonial evidence presented to the Court therefore does not suggest that A.R. has a particularly close relationship with Respondent's husband. Cf. De Vasconcelos v. De Paula Batista, No. 10-cv-00628, 2011 WL 806096, at *5 (E.D. Tex. Mar. 1, 2011), report and recommendation adopted, No. 10-cv-00628, 2011 WL 4591965 (E.D. Tex. Sept. 30, 2011), aff'd sub nom. Vasconcelos v. Batista, 512 F. App'x 403 (5th Cir. 2013) (noting the child's close relationship with the mother's husband). The Court has also learned little about A.R.'s relationships outside of the extended family. As such, even acknowledging that A.R. has some extended family in the United States who are a source of support, the Court nonetheless cannot find that this factor fully supports Respondent's contention that her son is settled.

In terms of his participation in the community, the fifth factor, A.R. attends church twice a month and partakes in activities with other children there, but until recently he engaged in no other extracurricular programs. At the time of the trial, A.R. had been playing soccer for only three months, meaning that for the majority of his time in the United States, he did not participate in any significant after-school activities. This factor, therefore, does not weigh in Respondent's favor.

The sixth factor focuses on Respondent's employment and financial stability. Both Respondent and her husband are employed and, together, have a sufficient income to offer A.R. financial stability, tilting this factor in favor of a finding that Respondent has met her burden.

Finally, A.R.'s immigration status is uncertain given that his mother has applied for asylum and is presently scheduled to have her master calendar hearing on November 3, 2025. That uncertainty alone, however, is insufficient to support a finding that A.R. is not settled. See

Moura, 67 F. Supp. 3d at 499–500 (the immigration status of child and respondent is generally "relevant only if there is an immediate, concrete threat of deportation").  Given that there is no formal resolution of Respondent's asylum case and thus no apparent immediate threat of deportation, the Court will not speculate on the outcome of the case and its pendency weighs neutral in the settled analysis.  Lozano v. Alvarez, 697 F.3d 41, 56 (2d Cir. 2012), aff'd sub nom. Lozano v. Montoya Alvarez, 572 U.S. 1 (2014) ("[T]he weight to be ascribed to a child's immigration status will necessarily vary.").

In sum, in considering the totality of A.R.'s circumstances, the Court cannot find that Respondent established the settled defense by a preponderance of the evidence.  This was a close call and a difficult decision.  In reaching it, the Court carefully considered Respondent's evidence, including A.R.'s age and the fact that he enjoys a stable and loving home, but in the final analysis, A.R.'s lack of strong community connections, absence of extracurriculars activities over the past two years, and attendance and performance issues at school does not support the conclusion that he is settled within the meaning of the Convention.

### E.  The Grave Risk Exception

Respondent argues that she is entitled to the grave risk of harm defense under Article 13(b) of the Hague Convention.  Specifically, Respondent argues that Petitioner demonstrates a pattern of "(1) physical abuse, (2) exposing the Child to age-inappropriate content, (3) recklessly breaking into neighbors' homes and stealing their belongings, and (4) concerning mental health issues," which would expose A.R. to a grave risk of harm should he be returned to Brazil.  [ECF No. 30 at 39–42].

The grave risk of harm exception requires Respondent to prove by clear and convincing evidence that "there is a grave risk that [A.R.'s] return would expose [him] to physical or

psychological harm or otherwise place [him] in an intolerable situation."  Hague Convention, art. 13(b).  See also 22 U.S.C. § 9003(e)(2)(A); 42 U.S.C. § 11603(e)(2)(A).  As the First Circuit has explained:

> The text of the article requires only that the harm be 'physical or psychological,' but context makes it clear that the harm must be a great deal more than minimal. Not any harm will do nor may the level of risk of harm be low. The risk must be 'grave,' and when determining whether a grave risk of harm exists, courts must be attentive to the purposes of the Convention. For example, the harm must be something greater than would normally be expected on taking a child away from one parent and passing him to another; otherwise, the goals of the Convention could be easily circumvented.

Walsh v. Walsh, 221 F.3d 204, 218 (1st Cir. 2000) (internal citations and quotations omitted).  A showing under this narrow defense is a high burden and "grave", under the Convention, means a more than serious risk, though the risk need not be immediate.  Moura, 67 F. Supp. 3d at 500; Charalambous v. Charalambous, 627 F.3d 462, 467 (1st Cir. 2010).  Importantly, the grave risk defense is not to be used "as a vehicle to litigate (or relitigate) the child's best interests." Danaipour, 286 F.3d at 14 (quoting Hague International Child Abduction Convention; Text and Legal Analysis, 51 Fed. Reg. 10,494, 10,510 (Mar. 26, 1986)).

Respondent has not established that returning A.R. to Brazil will expose him to physical or psychological harm.  As to her allegations that Petitioner was physically abusive toward her, "[s]pousal abuse . . . is a factor . . . [in the grave risk inquiry] because of the potential that the abuser will also abuse the child."  Tsarbopoulos v. Tsarbopoulos, 176 F. Supp. 2d 1045, 1057–58 (E.D. Wash. 2001); Abbott, 560 U.S. at 22 (if respondent demonstrates the child's return would put her at grave risk, courts can consider whether the child would suffer psychological harm as a result).  Respondent recounted one isolated incident where Petitioner twisted her harm, prompting her to call the police.  The Court in the clearest terms condemns Petitioner's behavior, but it cannot conclude that the circumstances here warrant a finding of risk of physical or

psychological harm to A.R. upon his return to Brazil.  Cf. Miltiadous v. Tetervak, 686 F. Supp. 2d 544, 554 (E.D. Pa. 2010) (extensive physical and emotional abuse respondent suffered at the hands of petitioner created a grave risk for the child).  Further, Respondent adduced no evidence showing that Petitioner ever behaved violently toward A.R.  Elyashiv v. Elyashiv, 353 F. Supp. 2d 394, 398–400 (E.D.N.Y. 2005) (grave risk exception found where father abused the mother in the children's presence and frequently hit the children); cf. Whallon, 230 F.3d at 460 (no grave risk of harm where petitioner had incidents of verbal and physical abuse toward respondent, but no long pattern existed and the abuse was never directed at the child).  As such, Respondent cannot prevail on this defense.

Further, Respondent has not demonstrated by clear and convincing evidence that Petitioner's mental health creates a grave risk of harm to A.R.  Respondent testified that on one occasion, after the parties had separated, Petitioner told her that he heard voices telling him to kill himself and showed her medicine that he was taking.  She also recalled an incident during their marriage, where he appeared to be sleepwalking and jumped out of a window, though she conceded that she was unsure whether Petitioner's behavior was related to any mental health condition.  Based on these facts alone, the Court cannot conclude that Petitioner's mental health condition would present a grave risk to A.R. if he returned to Brazil.  Neither, without more, can the Court arrive at such a conclusion based on the father's testimony that he has struggled with anxiety since approximately May 2022.

As to Respondent's other allegations—specifically, Petitioner's consumption of pornography and purported unlawful conduct—the Court similarly cannot find that she offered clear and convincing evidence that his behavior would put A.R. in grave risk.  See Baxter, 423

F.3d at 374 (noting that challenges relating to a parent's fitness as a guardian are normally reserved for custody proceedings in the home-state's family court system).

The Court, in other words, determines that A.R.'s return to Brazil would not expose him to a grave risk of harm or place him in an otherwise intolerable situation.

## V.    CONCLUSION

Based on the proceedings and records before it, the Court finds that Petitioner has established a *prima facie* case for the return of A.R. and that Respondent has not made out an affirmative defense that would preclude A.R.'s return to his home country.

The Court notes, as it often does in these cases, that it would be best for A.R., who is obviously loved by both of his parents as well as his extended family, for Petitioner and Respondent to work out a compromise arrangement that would allow the child to spend meaningful time with both of his parents without further protracted legal proceedings regarding the terms of custody. On a similar note, the Court underscores that it is not tasked with and has not made a determination regarding custody. The Hague Convention expressly states that "[a] decision under this Convention concerning the return of the child shall not be taken to be a determination on the merits of any custody issue." Hague Convention, art. 19. Therefore, in light of its findings, the Court leaves it to the Brazilian courts to make the relevant custodial and family law determinations. Vieira v. De Souza, 22 F.4th 304, 312 (1st Cir. 2022).

Accordingly, Edervaldo da Silva's Petition for Return of Child Under the Hague Convention is **GRANTED**.

**IT IS HEREBY ORDERED** that A.R. shall be returned to Brazil, his country of habitual residence, at Respondent's expense at a reasonable date and time mutually agreed upon by the parties.

29

**IT IS FURTHER ORDERED** that Respondent shall make all necessary arrangements associated with returning A.R. to Brazil.

**IT IS FURTHER ORDERED** that Respondent shall not, absent leave of this Court, remove A.R. from the District of Massachusetts pending his return to Brazil.

**IT IS FURTHER ORDERED** that counsel for Respondent shall file a notice with the Clerk of Court immediately upon A.R.'s arrival in Brazil, indicating that Respondent has fully complied with the terms of this Order.

**SO ORDERED.**

February 28, 2025

*/s/* Allison D. Burroughs
ALLISON D. BURROUGHS
U.S. DISTRICT JUDGE